**SO ORDERED: September 28, 2011.**



**Basil H. Lorch III**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| STACY LEA BAKER, | ) | Case No. 10-90127-BHL-7 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| MURPHY OIL USA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. No. 09-59029 |
| | ) | |
| STACY LEA BAKER, | ) | |
| | ) | |
| Defendant. | ) | |

## JUDGMENT

This matter is before the Court on the Plaintiff's **Complaint to Determine Liability and Non-Dischargability of Debt Under 11 U.S.C. § 523**, as supplemented by its **More Definite**

**Statement of the Claim** [Docket # 41].[1]  The Court tried the matter on June 1, 2011.  The Plaintiff and Defendants submitted post-trial briefs [Docket #s 71 and 72, respectively] on June 17, 2011.

Murphy Oil USA, Inc. ("Murphy"), the Plaintiff, seeks a determination that the Defendants, John M. Baker and Stacy Lea Baker, are liable to it under various state law theories.  Further, Murphy seeks a judgment liquidating the Bakers' alleged obligations to Murphy and finding that the debts are excepted from discharge in their respective Chapter 7 bankruptcy cases pursuant to 11 U.S.C. § 523(a)(2), (4), or (6).  Having considered the foregoing, and for the reasons set forth below, the Court finds Mr. Baker to be liable to Murphy in the amount of $691,757.78, which judgment may not be discharged in Mr. Baker's bankruptcy case.  Further, Mr. Baker is liable to Murphy for its reasonable attorney's fees and certain of its costs, and this, too, is excepted from discharge.  In contrast, Murphy did not meet its burden of proof in its case against Mrs. Baker, and the Court finds that her obligations to Murphy are wholly discharged by the Court's order of May 11, 2011.

I

Mr. and Mrs. Baker were at all relevant times husband and wife and co-owners of several modest enterprises in and around Orange County, Indiana.  Mr. Baker's proprietorship, Baker Oil, distributed petroleum fuel products to five area retailers and a few local farmers.  The Bakers owned three of these gas stations, having succeeded in their interests from Mr. Baker's parents.  For Mr. Baker, these enterprises were a family legacy, and he spent most of his life

---

[1] The case brought against Defendant John M. Baker was consolidated for purposes of administration and trial with that brought by the Plaintiff against Stacy Lea Baker.  *See Murphy Oil USA, Inc. v. Stacy Lea Baker (In re Stacy Lea Baker)*, adversary proceeding number 10-59029 under case number 10-90127.  Unless otherwise indicated, references to docket numbers refer to the above-styled case against Mr. Baker.

2

attempting to advance their interests. Mrs. Baker earned wages for her work maintaining the books, dealing with vendors, and training and supervising employees.

Murphy was a vendor to Baker Oil. In 2006, they entered into an arrangement whereby Murphy authorized Baker Oil to purchase fuel from Murphy on credit. The terms of the credit agreement required Baker Oil to pay for fuel purchases within twelve days, so long as its account balance remained under $150,000. The agreement contemplated credit purchases greater than the "limit;" if Baker Oil's account balance exceeded $150,000, the excess was to be paid immediately. Such payments were to be accomplished by electronic funds transfers initiated by Murphy from a checking account jointly held by Baker Oil Company and Mrs. Baker. Both Mr. and Mrs. Baker signed a personal guarantee of Baker Oil's obligations to Murphy.

For more than a year, Murphy and Baker Oil transacted regular business. Baker Oil acquired fuel from a terminal where Murphy was one of several suppliers from which Baker Oil could choose to purchase fuel. This task was accomplished by Joe Burton, a longtime agent of Baker Oil, who took possession of fuel from the terminal in Princeton, Indiana, and delivered it to the gas stations and a few storage tanks maintained by Baker Oil in Orange County, about an hour and a half away. In the ordinary course of business, Baker Oil purchased fuel from Murphy costing approximately $300,000 to $500,000 per month, divided into more than a dozen separate purchases. Murphy became Baker Oil's biggest vendor, though it purchased fuel from others. Baker Oil frequently exceeded its credit limit by tens of thousands of dollars, but such excesses never persisted for more than a few days and never prompted Murphy to restrict the credit it was willing to extend to Baker Oil. Though Murphy, like many in the industry, had installed at other fuel terminals technology that cut off a purchaser's access to fuel when the purchaser exceeded its credit limit, Murphy had not yet installed such technology at the terminal in Princeton. Due

3

to its antiquated information systems, Murphy would not learn of Baker Oil's purchases until two business days after fuel was drawn.

In 2008, the Bakers were facing pressure from the state tax authorities, who alleged that the Bakers owed hundreds of thousands of dollars in delinquent sales taxes, fuel taxes, withholding taxes on behalf of their employees, and income taxes. Schedules D and E of Mr. Baker's petition, filed less than a year after the events at issue, suggest that his state tax debt may have exceeded two million dollars. The Bakers had failed to file dozens of state and federal tax returns for periods that were now years past. Mr. Baker's Statement of Financial Affairs indicates he earned no income in the three years before he sought relief in the Bankruptcy Court. In addition, Mrs. Baker struggled with ongoing serious health problems that consumed her energy and kept her from the bookkeeping.

In the spring of 2008, fuel prices were historically high and volatile. Consequently, Mr. Baker, hoping to avoid buying high and selling low, had allowed Baker Oil's inventories to shrink. During the week ending Saturday, April 12, 2008, Mr. Baker consulted with Mr. Burton and a local fuel broker and price prognosticator and concluded that prices were going to continue to rise in the near- to medium-term, and that then was as good a time as any in the foreseeable future to purchase fuel. Mr. Baker instructed Mr. Burton to "top off the tanks."

Thereafter, beginning on the evening of Friday, April 11, 2008, and continuing around the clock until the last load of fuel was drawn in the early morning hours of Monday, April 14, 2008, Baker Oil took as much of Murphy's fuel as it had the capacity to take. This impressive logistical operation was choreographed by Mr. Burton, who had to enlist two other drivers to assist him. When one of the drivers was indisposed by a personal matter, Mr. Burton alerted Mr. Baker, who himself filled in for a midnight run and pulled a load of fuel at 2:10 a.m. on Saturday

4

morning. When the operation was completed, drivers working for Baker Oil had taken approximately 189,000 gallons of fuel, representing more than twenty truckloads and consisting of a variety of grades of unleaded gasoline and diesel fuel, including significant quantities of high-grade products that Baker rarely bought and sold. The total price for the fuel taken over the weekend was $723,578.64. In the ordinary course of business, such a quantity of fuel would satisfy Baker Oil's needs for a month or more. Never before had Baker Oil purchased on such a scale. Its business records for the months leading up to the taking show no purchases greater than $50,000; it typically purchased fuel from Murphy by the individual truckload, which cost just over $20,000.

On Monday, Murphy initiated an electronic funds transfer from Baker Oil's checking account. The bank declined the transfer, which had been previously scheduled to pay for a prior purchase for just under forty-five thousand dollars, for insufficient funds. That day or the next, Murphy's credit officer contacted Mrs. Baker to discuss the declined transfer. Both were ignorant of Baker Oil's weekend activities. Mrs. Baker was alarmed to learn the account lacked funds to cover this ordinary transaction, and she began to investigate. On Tuesday and Wednesday, Murphy initiated smaller transfers to cover other ordinary purchases Baker Oil made before the weekend; both were declined for insufficient funds.

Soon, Mrs. Baker was aware of the weekend's taking and knew that Baker Oil could not hope to satisfy the enormous transfer that Murphy would initiate from its checking account. On Wednesday, Mrs. Baker opened a new account on behalf of Baker Oil at another bank, and commenced paying other fuel vendors from it. On Thursday, Mrs. Baker ordered the bank to stop payment on transfers initiated by Murphy from the old checking account.

The next week, on April 23, Murphy's regional manager, who was in Indianapolis for a trade show, traveled to Orange County and called unannounced on the gas stations to confront the Bakers. Neither appeared, but they agreed to meet the next day at the trade show, where relations between Murphy and the Bakers became acrimonious and it became clear that informal terms for a short-term repayment were not feasible. Murphy soon sued the Bakers in state court. With Murphy's suit in state court proceeding toward a judgment, Mr. Baker filed for relief in this Court on December 15, 2008.[2]

Murphy's complaint sets forth six alternative counts under which it asks for a determination of liability against the Bakers. Two sound in contract, seeking judgment against the Bakers as unincorporated co-proprietors of Baker Oil and as guarantors of its debts. The Bakers have not meaningfully disputed their contractual liability to Murphy. The remaining causes of action are torts based on an Indiana statute that provides a private right of action for victims of crimes, who may recover treble damages, their filing fees and travel costs, and a reasonable attorney's fee. Ind. Code § 34-24-3-1. Murphy alleges the Bakers' actions constitute theft, conversion, fraud, and check deception, as those crimes are defined by Indiana law.

Further, Murphy requests a determination that the judgment it seeks against the Bakers is excepted from discharge in their Chapter 7 bankruptcy cases under one of three grounds provided in § 523(a).[3] First, Murphy alleges, pursuant to § 523(a)(2)(A), that the Bakers obtained the fuel by false pretenses or a false representation. Second, under § 523(a)(4), Murphy accuses the Bakers of larceny, as that term is defined by federal law. Third, Murphy alleges that

---

[2] Murphy initiated this adversary proceeding by its complaint filed against Mr. Baker on November 9, 2009. Mrs. Baker filed her own petition for relief in this Court on January 21, 2010. Murphy filed its complaint against her on May 10, 2011. Murphy's cases against the Bakers were consolidated for trial on June 22, 2010.

[3] Unless otherwise indicated, all citations to statutes refer to Title 11 of the United States Code (the "Bankruptcy Code").

the Bakers willfully and maliciously injured its property, and that its consequent damages are nondischargeable pursuant to § 523(a)(6).

*II*

This adversary proceeding arises under the Debtors' Chapter 7 bankruptcy cases.[4] As a determination of the dischargeability of a debt under § 523, the matter is a core proceeding over which this Court has jurisdiction pursuant to 28 U.S.C. §§ 1334, 157(a), and 157(b)(2)(I). Though related proceedings were pending in state court at the time Mr. Baker commenced his bankruptcy case, the state court did not enter a judgment or make any other preclusive findings. The Court, in the exercise of its equitable power, has jurisdiction to liquidate a nondischargeable debt and enter a money judgment. *N.I.S. Corp. v. Hallahan*, 936 F.2d 1496, 1508 (7th Cir. 1991). *See also Alexander v. Hillman*, 296 U.S. 222, 242 (1935) ("the rule generally followed by courts of equity [is] that, having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief").

In order to prevail, Murphy must have proved by a preponderance of the evidence both the Bakers' liability and the extent to which such liability is excepted from discharge. *See Grogan v. Garner*, 498 U.S. 279 (1991) (the proper burden of proof for all claims under § 523 is preponderance of the evidence). Such a two-step showing must be made independently as to each of the Bakers. Mindful of the Bankruptcy Code's "fresh start" policy, the Court construes complaints to determine the dischargeability of debts not involving domestic support strictly against an objecting creditor and liberally in favor of a debtor. *In re Crosswhite*, 148 F.3d 879 (7th Cir. 1998).

---

[4] Mr. Baker's petition for relief was originally filed under Chapter 11, but was converted to a petition under Chapter 7 on Mr. Baker's motion.

*III*

A.   *Liability on Contract*

The contractual liability of both Mr. and Mrs. Baker to Murphy was never seriously in doubt. The Bakers denied it in their respective answers, but neither attempted to rebut evidence presented by Murphy that Baker Oil was, on the date Mr. Baker filed his case with this Court, liable to Murphy for a total amount of at least $841,757.78, corresponding both to the price of the fuel taken during the weekend and earlier, more modest purchases made in the ordinary course of business. Further, though Murphy did not prove that Mrs. Baker was an owner of Baker Oil, it did show that Mr. Baker owned and operated the company, which had no independent legal existence. Similarly, the Bakers did not raise questions about the enforceability of their personal guarantees of Baker Oil's obligations to Murphy. The Court finds the evidence presented by Murphy on that question to be persuasive.

B.   *Liability Under Indiana's Crime Victim's Relief Act*

Notwithstanding the Court's determination of the Bakers' contractual liability, it is necessary to consider Murphy's additional counts, as they present the possibility of a much larger liability based on treble damages and recovery of some of Murphy's litigation costs and attorney's fees. Indiana's Crime Victim's Relief Act, Ind. Code § 34-24-3-1, provides, *inter alia*, that one who "suffers a pecuniary loss as a result of a violation of IC 35-43…may bring a civil action against the person who caused the loss" for "[a]n amount not to exceed three (3) times the actual damages," in addition to court costs, a reasonable attorney's fee, and certain expenses related to the litigation. In turn, Indiana Code Article 35-43 defines criminal offenses against property.[5] Murphy alleges that the Bakers' conduct satisfies the elements of multiple

---

[5] Though a plaintiff must prove the elements of a particular criminal statute in order to prevail, the action is civil in nature and a plaintiff need only establish his right to recover by a preponderance of the evidence. *Obremski v.*

property crimes, which we consider in turn and evaluate with respect to each of the Bakers. Finally, finding that Murphy is entitled to a judgment for conversion against Mr. Baker, we consider the imposition of exemplary damages and award costs.

*1. Conversion*

To begin with, Murphy accuses the Bakers of theft and the lesser crime of conversion, as those offenses are defined under Indiana Code §§ 35-43-4-2(a)[6] and 35-43-4-3, respectively. Conversion consists of the knowing or intentional exertion of unauthorized control over property of another;[7] in order to prove theft, a felony offense in the criminal context, a litigant must make the same showing as is required for misdemeanor conversion, and must prove an additional element: that a defendant intended to deprive the property's rightful owner of part of its value or use. *Moncrief v. State*, 525 N.E.2d 1286 (Ind. Ct. App. 1988). Because theft subsumes conversion and requires extra proof, and because proof of either offense can be a basis for recovery under Ind. Code § 34-24-3-1, it is unnecessary to consider theft in this context[8] and we can confine ourselves to determining whether the Bakers committed conversion.

The Court finds that Mr. Baker intended and caused the taking that Baker Oil made during the long weekend. The Court is not persuaded by Mr. Burton's testimony that he simply

---

*Henderson*, 497 N.E.2d 909 (Ind. 1986). No criminal conviction is necessary. *Roake v. Christiansen*, 528 N.E. 2d 789 (Ind. Ct. App. 1988).

[6] Ind. Code § 35-43-4-2 defines both theft and the closely related crime of receiving stolen property in its subsections (a) and (b), respectively. Though Murphy does not specify which of the two subsections the Bakers are to have violated, the relevant count in its complaint is partially titled "theft," and the language Murphy uses precisely tracks the elements of theft rather than receiving stolen property.

[7] The elements of criminal conversion are different from those required to prove tortious conversion at Indiana common law. *Lambert v. Yellowbird, Inc.*, 496 N.E.2d 406 (Ind. Ct. App. 1986), *clarified*, 498 N.E.2d 80 (Ind. Ct. App. 1986). Murphy did not allege the latter.

[8] Proof of conversion under Ind. Code § 35-43-4-3, under which a conviction may obtain for "knowingly" converting another's property, has been found insufficient to except a consequent obligation from discharge. *Garoutte v. Damax, Inc.*, 400 B.R. 208 (S.D. Ind. 2009). In contrast, a conviction for theft has been found to satisfy the requirements of § 523(a)(6) and to be entitled to preclusive effect in a proceeding to determine dischargeability brought under that subsection. *Babbs v. Hale (In re Hale)*, 11-59004 (Bankr. S.D. Ind. 2011). Consequently, the distinction between the two crimes would be tremendously important if the Court were asked to determine whether a judgment for either offense was nondischargeable. However, in the instant case, in which Murphy lacks a nonbankruptcy judgment against either of the Bakers, questions of dischargeability are better analyzed on their own. *See* Part IV of the Court's judgment, *infra*.

misinterpreted Mr. Baker's instructions. Mr. Burton was intimately involved in Baker Oil's operations for many years, and was familiar with the scale and frequency of its fuel purchases in the ordinary course of business. Further, Mr. Burton often exercised his own independent judgment about when to purchase fuel. It is implausible that someone with Mr. Burton's experience would have misconstrued an ambiguous directive to "top off the tanks" as an order to purchase over fifteen times more fuel than Baker Oil typically purchased. It is more likely, in the Court's estimation, that Mr. Burton did precisely as he was told by Mr. Baker.

A finding that Mr. Baker committed conversion is also supported by the fact that Mr. Baker himself transported a truckload of fuel during the wee hours of Saturday morning. It is incredible that Mr. Baker, whose company bought and sold only a very few truckloads of fuel each week, would not have questioned the need to employ him for a run in the dead of night at the outset of the weekend, if in fact he believed that the truckload of fuel was being purchased in the ordinary course. Rather, the Court concludes that Mr. Baker was well aware of the unauthorized size of the weekend taking. Mr. Baker urges the Court that he believed that Murphy installed technology at the terminal that would prevent Baker Oil from drawing fuel in excess of its credit limit; the Court does not find this testimony persuasive in light of the many times that Baker Oil had drawn fuel beyond its credit limit in the weeks leading up to the weekend. Moreover, the Court infers that Mr. Baker knew that Baker Oil lacked the liquidity and sales volume to repay Murphy for the excess according to the terms of their agreement.

The remaining elements of Mr. Baker's conversion fall neatly into place. Baker Oil was authorized, by its credit agreement with Murphy, to take up to $150,000 of fuel on credit. Heading into the weekend, Baker Oil's credit account with Murphy had a balance of $118,179.14, which Baker Oil owed Murphy for purchases made in the ordinary course of

10

business. Accordingly, Baker Oil was authorized to take additional fuel with a price of $31,820.86 before it made another payment to Murphy. Rather, at Mr. Baker's direction, Baker Oil during the weekend took fuel with a price of $723,578.64, exceeding its authority by $691,757.78. Murphy seeks a finding that all Baker Oil's liability to it represents a conversion. This goes too far, including the price of fuel Murphy authorized Baker Oil to take. Only the unauthorized taking, corresponding to $691,757.78, constitutes a conversion.

With respect to Mrs. Baker, Murphy did not present evidence that she committed conversion. There was no evidence that Mrs. Baker knew about the weekend taking before it was too late for her to do anything about it. Further, while Murphy demonstrated that Mrs. Baker was involved in the management of Baker Oil's finances and personnel, there was no evidence that she had any control over the purchase or disposition of Baker Oil's fuel. The Court finds that her bookkeeping functions do not lead to liability for conversion.

2.   *Fraud*

Next, Murphy asks the Court to find that the Bakers committed fraud, as that offense is defined by Indiana Code § 35-43-5-4. Murphy does not identify the paragraph under which it seeks a determination of the Bakers' liability. One can commit fraud if his conduct satisfies the elements of one of ten different alternative paragraphs contained in the statute. Most of these alternatives, along with the bulk of the reported case law interpreting the statute, relate to fraud involving a credit card. However, the Bakers are wrong in their insistence that the statute only applies to credit card fraud; paragraphs (8) through (10) are not so limited. *See, e.g.*, *Klinker v. First Merchants Bank, N.A.*, 938 N.E.2d 846 (Ind. Ct. App. 2010) (affirming judgment for creditor arising from loan to auto dealer for purchase of inventory). The language of Murphy's complaint tracks paragraph (8), which provides, in pertinent part, that fraud obtains where a

11

person "with intent to defraud the person's creditor…transfers property." Ind. Code § 35-43-5-4(8). Nevertheless, the Court finds the statute inapposite to the facts alleged.

As fraudulent intent can most often only be determined by inference, Indiana law requires courts to consider badges of fraud present in a given transaction. *Klinker*, 938 N.E.2d at 850. "As no single indicium constitutes a showing of fraudulent intent *per se*, the facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern of fraudulent intent." *Otte v. Otte*, 655 N.E.2d 76, 81 (Ind. Ct. App. 1995). Indiana Courts have identified eight such factors.

> These factors include:
> 1. transfer of property by a debtor during the pendency of a suit;
> 2. transfer of property that renders the debtor insolvent or greatly reduces his estate;
> 3. a series of contemporaneous transactions which strip a debtor of all property available for execution;
> 4. secret or hurried transactions not in the usual mode of doing business;
> 5. any transaction conducted in a manner differing from customary methods;
> 6. a transaction whereby the debtor retains benefits over the transferred property;
> 7. little or no consideration in return for the transfer; and
> 8. a transfer of property between family members.

*Id*.

Perhaps because other criminal statutes, such as conversion and theft, are better suited to address unlawful takings, most Indiana courts that have applied the statute to transactions not involving credit cards, including the Court of Appeals in *Klinker* and *Otte*, have done so where there was either an allegation that property was transferred to an insider in an attempt to avoid attachment by a transferee's creditors or an allegation that collateral was disposed of out of trust. Among the eight badges of fraud considered by Indiana courts, only one, "secret or hurried transactions not in the usual mode of doing business," fits Murphy's allegations. The other factors clearly contemplate the concealment of assets or improprieties in a fiduciary relationship or security agreement.

12

Accordingly, the Court finds that Murphy's claim under Ind. Code § 35-43-5-4(8) fails as a matter of law. Murphy has not cited a case on point, and the Court is not inclined to break new ground on a matter of state law.

3.   *Check Deception*

Finally, check deception, as provided by Indiana Code § 35-43-5-5, is the only crime alleged that implicates events after the weekend taking, and, therefore, is the only one of the counts brought under Indiana Code § 34-24-3-1 that could apply to Mrs. Baker, who did not know of the taking until days after it was committed. Murphy contends that Mrs. Baker committed check deception by authorizing electronic funds transfers knowing that they would not be honored by the bank where Baker Oil maintained its account. Assuming, without deciding, that Indiana Code § 35-43-5-5 is not limited to checks and applies to bank drafts, there is no evidence that either of the Bakers had any inclination not to honor their agreement with Murphy according to its terms when they entered into it and authorized the electronic funds transfers in 2006. To the extent Murphy claims that Mrs. Baker committed check deception by ordering the bank to stop payment on Murphy's serial attempts to draw from Baker Oil's account, the Court finds that this did not constitute fraud. Mrs. Baker's actions in this regard were understandable and did not damage Murphy. It was impossible for Baker Oil to satisfy Murphy's drafts, and Mrs. Baker was simply trying to avoid the fees the bank charged every time Murphy initiated a transfer that was not honored. Too, Murphy's check deception claim against Mr. Baker fails, as there was no evidence that he had any involvement in Baker Oil's finances.

4.   *Exemplary Damages and Awardable Costs*

As the Court found that Mr. Baker is liable to Murphy under Indiana Code § 34-24-3-1 for conversion as defined by Indiana Code § 35-43-4-3(a), we must now consider both whether

13

to impose exemplary damages as authorized by statute and the appropriate additional amount to award Murphy for its reasonable attorney's fee and certain of its costs for which Indiana Code § 34-24-3-1 requires compensation.

The statute permits a trial court to award exemplary damages in "an amount not to exceed three (3) times the actual damages of the person suffering a loss. Ind. Code § 34-24-3-1(1). However, "the award of damages above the actual damages is within the discretion of the trial court." *Burgett v. Haynes*, 572 N.E.2d 1296, 1298 (Ind. Ct. App. 1991) (interpreting Ind. Code § 34-4-30-1, the predecessor of Ind. Code § 34-24-3-1). Treble damages are not mandatory; they are merely the upper limit of a trial court's authority under the statute. A court may decline to impose exemplary damages altogether. *Citizens Nat'l Bank of Evansville v. Johnson*, 637 N.E.2d 191, 195 (Ind. Ct. App. 1994).

The Court finds that exemplary damages are not warranted by the facts of the case. Though Mr. Baker knew when he took the fuel that Baker Oil would not be able to comply with the strict terms of its agreement with Murphy, it is the Court's opinion that Mr. Baker saw the rising oil costs as an opportunity to allay his pressing tax debt. Though it may have been fanciful, Mr. Baker sincerely intended to repay Murphy after Baker Oil had righted its ship. There was no evidence that the proceeds of the converted fuel were diverted to Mr. Baker's personal use. In fact, there was little evidence at all about the disposition of the fuel sales proceeds. Rather, the evidence showed that Mr. Baker took no distributions from Baker Oil before or after the taking, and that Mrs. Baker continued to earn a meager wage. The Court is left with Mr. Baker's uncontroverted testimony that the funds were expended in the ordinary, albeit unsuccessful, course of Baker Oil's business in the months between the taking and the filing of Mr. Baker's bankruptcy case.

Additionally, the Court declines to award exemplary damages because Murphy had the knowledge and ability to protect itself and failed to do so. Murphy is a sophisticated victim, a national corporation that routinely engages in large credit transactions involving a movable, valuable product that is essentially unrecoverable after it leaves Murphy's constructive possession. Murphy could have availed itself of prevalent technology that would have prevented Baker Oil from drawing more than two truckloads during the weekend. Its failure to employ such safeguards was imprudent, and should not be rewarded with a windfall, even at the expense of a dishonest debtor.

A successful plaintiff's attorney's fee, however, is different. The statute "does not leave the recovery of attorneys' fees to the discretion of the trial court." *Burgett*, 572 N.E.2d at 1298. On the contrary, "the trial court must award a reasonable fee as part of the plaintiff's recovery" where the plaintiff proves that it has incurred an attorney's fee. *Id.* Similarly, paragraphs (4) through (7) of Indiana Code § 34-24-3-1 specify certain costs that a successful plaintiff is entitled to recover. In the instant case, Murphy did not introduce evidence of its attorneys' fees or costs. Murphy may, within thirty days after the date of this order, submit an affidavit detailing the same for the Court's consideration.

C.  *Determination of Liability Under Nonbankruptcy Law*

The Court finds Mr. Baker owes Murphy $841,757.78 as proprietor of Baker Oil and the guarantor of its debts. Further, the Court finds that Mr. Baker is liable to Murphy in the amount of $691,757.78 plus its reasonable attorney fees for Baker Oil's conversion of its fuel during the weekend. Relating to the same transactions, these liabilities are concurrent.

The Court finds Mrs. Baker is liable only as a guarantor. She owes Murphy $841,757.78, jointly and severally with Mr. Baker.

*IV*

Having found Mr. and Mrs. Baker liable to Murphy under nonbankruptcy law, the Court must conduct the second phase of its analysis and determine whether and to what extent such liability passes through the filter of § 523 and survives the Bakers' bankruptcies.

A.	*Mr. Baker's Liability for Conversion is Nondischargeable under § 523(a)(6)*

Of the three subsections of § 523(a) pled by Murphy, the Court finds § 523(a)(6) the most suited to the facts. A debt is excepted from discharge by § 523(a)(6) if it is for "willful and malicious injury by the debtor to another entity or to the property of another entity." When the Bankruptcy Reform Act of 1978 was passed, this broadly phrased provision was explicitly intended by Congress to encompass conversions. *See* 124 Cong. Rec. S17412 (daily ed. Oct. 6, 1978); *reprinted in* Volume D Collier on Bankruptcy App. Pt. 4(f)(iii) at App. Pt. 4-2557 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev.) ("The phrase "willful and malicious injury" covers a willful and malicious conversion," said Sen. DeConcini in floor remarks prior to passage of the compromise bill.).

The intent standard imposed by § 523(a)(6) is two-pronged; a creditor must satisfy both requirements. *See Carillo v. Su*, 290 F.3d 1140 (9th Cir. 2002). "Willful means deliberate or intentional." *In re Thirtyacre*, 36 F.3d 697, 700 (7th Cir. 1994) (quoting *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986)). The definition of "malicious" in this context is perhaps harder to pin down. The Seventh Circuit, following the Sixth Circuit in *Wheeler*, characterized maliciousness as "conscious disregard of one's duties or without just cause or excuse." *Thirtyacre*, 36 F.3d at 700. However, the Supreme Court later held that negligent or reckless acts do not fit the statute, arguably raising the bar in requiring proof that a debtor inflicted "a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."

16

*Kawaauhau v. Geiger*, 523 U.S. 57 (1998) (original emphasis). To be sure, the two elements of intent can be difficult to differentiate. Following *Garoutte v. Damax, Inc.*, 400 B.R. 208, 213 (S.D. Ind. 2009), the Court concludes that in the context of a taking, a creditor must show that a debtor "deliberately or intentionally deprives another of his property in conscious disregard of his duty...[and] without just cause or excuse[, and that a] debtor does not need to intend that the creditor be harmed financially."[9]

Mr. Baker's conversion meets this standard and, accordingly, his liability under Indiana Code § 34-24-3-1 may not be discharged. Indiana's criminal conversion statute, Ind. Code § 35-43-4-3(a), provides that a conviction obtains where a person "knowingly" exerts unauthorized control over property, and in certain cases this may not satisfy the intent requirement of § 523(a)(6). *Garoutte*, 400 B.R. at 214. However, Mr. Baker's conversion was intentional. He was aware of the terms of Baker Oil's credit agreement with Murphy and was intimately familiar with Baker Oil's capacity to transport and store fuel. When Mr. Baker instructed Mr. Burton to "top off the tanks," he knew that this would cause Baker Oil to take far more fuel than it was authorized, and he could foresee that the excess, i.e. the property converted, would be approximately what it was. It is immaterial to the analysis under § 523(a)(6) that Mr. Baker sincerely intended to pay Murphy back at some later, undefined time.

The Court's finding against Mr. Baker under § 523(a)(6) coupled with the Court's determination that Mrs. Baker acted in good faith and is only liable on contract makes it unnecessary to consider Murphy's arguments under § 523(a)(2)(A) and 523(a)(4).

B.   *Whether to Impute Nondischargeability to Mrs. Baker*

---

[9] Though "[t]he law often equates malice with ill will or a similar desire to inflict harm on a person[,] the Seventh Circuit and other federal courts consistently have refused to interpret § 523(a)(6)'s 'malicious' requirement in this way in conversion cases." *Garoutte*, 400 B.R. at 208 fn. 4. *But see Johnson v. Logue*, 294 B.R. 59, 63 (B.A.P. 8th Cir. 2003) ("The debtor's knowledge that he or she is violating the creditor's legal rights is insufficient to establish malice absent some additional aggravated circumstances.").

17

Having found that Mr. Baker's liability to Murphy is nondischargeable but that Mrs. Baker's conduct, in and of itself, does not meet the criteria for any of the three provisions under § 523(a) pled by Murphy, we must now consider Murphy's argument that Mr. Baker's bad acts should be imputed to her despite her clean hands because she was a "co-proprietor" of Baker Oil with her husband.

The law has long held, based on basic principles of agency, that

> if, in the conduct of partnership business, and with reference thereto, one partner makes false or fraudulent misrepresentations of fact to the injury of innocent persons who deal with him as representing the firm, and without notice of any limitations upon his general authority, his partners cannot escape pecuniary responsibility therefor upon the ground that such misrepresentations were made without their knowledge.

*Strang v. Bradner*, 114 U.S. 555, 561 (1885) (interpreting the Bankruptcy Act of 1867). Under § 523(a)(2) of the Bankruptcy Code, courts have continued to apply *Strang* to innocent debtors. *E.g.*, *Deodati v. M.M. Winkler & Assocs.*, 239 F.3d 746 (5th Cir. 2001); *BancBoston Mortg. Corp. v. Ledford*, 970 F. 2d 1556 (6th Cir. 1992), *cert. denied*, 507 U.S. 916 (1993); *Tsurukawa v. Nikon Precision, Inc.*, 287 B.R. 515 (B.A.P. 9th Cir. 2002). *But see Tobin v. Sans Souci Ltd. P'ship*, 258 B.R. 199 (B.A.P. 9th Cir. 2001) (rejecting imputed fraud to shareholder on the basis of corporate alter ego). Some, though, have imposed a heightened requirement of constructive knowledge. *E.g.*, *Walker v. Citizens State Bank of Maryville, Mo.*, 726 F.2d 452 (8th Cir. 1984).

The general rule in bankruptcy is that, in order to prevent discharge, fraud must be actual or positive fraud and not fraud implied in law. *See Neal v. Clark*, 95 US. 704, 709 (1877). The doctrine of imputed fraudulent intent is an exception to this basic rule. *See Thul v. Ophaug*, 827 F.2d 340 (8th Cir. 1987); *Driggs v. Black*, 787 F.2d 503 (10th Cir. 1986); *Schweig v. Hunter*, 780 F.2d 1577 (11th Cir. 1986). Murphy has not cited and the Court has not identified any authority for the proposition that nondischargeability may be imputed to an innocent debtor outside the context of § 523(a)(2)(A). Consequently, the Court must determine whether Murphy has proven

that Mr. and Mrs. Baker were general partners and, if so, whether Mr. Baker's conduct satisfies the elements of § 523(a)(2)(A). Because the Court answers the first question in the negative, it is not necessary to reach the second part of the inquiry and do not need to decide whether *Strang* is viable and if so, whether it is subject to additional limitations.

Whether a partnership exists is controlled by state law. The existence of a partnership is a question of fact. *Gates v. Houston*, 897 N.E.2d 532, 535 (Ind. Ct. App. 2008). Indiana has enacted the Uniform Partnership Act, Ind. Code § 23-4-1-1 *et seq.*, which defines a partnership as "an association of two or more persons to carry on as co-owners of a business for profit." Ind. Code § 23-4-1-6(1). The statutory guidelines for determining whether a partnership exists provide, *inter alia*, that "[t]he sharing of gross returns does not of itself establish a partnership," and that "[t]he receipt by a person of a share of the profits of a business is prima facie evidence that the person is a partner in the business [unless] such profits were received in payment… [a]s wages of an employee." Ind. Code § 23-4-1-7. The Indiana Court of Appeals has construed these statutes to require proof that the alleged partners (1) joined together to carry a trade for their common benefit, (2) each contributed property or services, (3) each had an interest in the profits, (4) formed a "contract of association for the purpose of sharing profits and losses," and (5) had an intention to form a partnership. *Copenhaver v. Lister*, 852 N.E.2d 50, 58-59 (Ind. Ct. App. 2006).

When applying the statutory factors to spouses, Indiana courts have required a heightened showing, since "cotenancy of property and the sharing of losses and profits of a business…are consistent with the usual marital arrangement." *Soley v. VanKeppel*, 656 N.E.2d 508, 513 (Ind. Ct. App. 1995). Spouses have been found to be partners where the alleged partner performed services for the business without wage compensation, guaranteed debts of the enterprise, and

19

held herself out accordingly in her tax returns. *Johnson v. Wiley*, 613 N.E.2d 446 (Ind. Ct. App. 1993). In contrast, spouses have been found not to be partners where there was no written agreement between the partners and the alleged partner drew regular wages. *Copenhaver*, 852 N.E.2d 50.

In the instant case, Murphy did not prove that Mrs. Baker was an owner of Baker Oil. There was uncontroverted evidence that Mrs. Baker drew regular wages as compensation for her work on behalf of Baker Oil. Mr. Baker testified that he purchased the company from his parents; there was no evidence that Mrs. Baker made any capital contributions. There was no evidence of a written or oral agreement between the Bakers to form a partnership. The Bakers' tax returns were not before the Court. Nowhere in the writings that memorialized the agreement between Murphy and Baker Oil was Mrs. Baker referred to as an owner, partner, or co-proprietor. The Court finds it to be unpersuasive that Mrs. Baker guaranteed her husband's company's obligation, or that she, as the bookkeeper, had access to Baker Oil's accounts. Spouses with no connection to a business routinely guarantee debts and nearly all bookkeepers have access to accounts.

V

For the foregoing reasons, the Court enters a judgment for Murphy against Mr. Baker in the amount of $691,757.78. If Baker submits an affidavit of its attorney fees and costs within thirty days, the Court will augment its judgment by the reasonable amount of those fees and the costs awardable under Indiana law. Mr. Baker may not discharge this judgment in bankruptcy.

Further, the Court finds that Mrs. Baker's liability to Murphy was not excepted from her discharge. She has no further obligation to Murphy.

IT IS SO ORDERED.

###